J. W. WINBORNE v. EVA H. McMAHAN, Administratrix of W. H. McMAHAN, Deceased.

(Filed 28 February, 1934.)

1. **Sales A a—Where parties agree upon sale, and nothing remains to be done but payment of agreed price, sale is consummated.**

Evidence that a party agreed to purchase certain specific stock at a designated price and that the seller agreed to sell at the price named, and that the parties agreed that the purchase price should be paid to a bank in which the seller had hypothecated the stock as security for a loan, and that the seller had directed the bank to release the stock upon the payment of the purchase price *is held* sufficient to establish a contract of sale.

WINBORNE *v.* McMAHAN.

**2. Evidence D b—Disinterestedness of witness held established and his testimony of transaction with decedent was competent.**

Defendant's intestate made two separate contracts with the holders of stock in a corporation to purchase their respective holdings. In an action by one of the stockholders to recover on the contract of sale the other testified that he had no claim against the estate on his contract. *Held,* the witness was not interested in the event, and his testimony as to transaction between decedent and plaintiff as to the contract of sale of plaintiff's stock was competent. C. S., 1795.

**3. Evidence E e—**

Defendant's admission of truth of material allegation in original complaint held competent in evidence although amendment to complaint was subsequently filed making immaterial change in paragraph admitted.

**4. Evidence E d—Attorney's admissions in scope of authority in management of estate held competent in action against the estate.**

The admissions in the pleadings and the evidence established that declarant was attorney for the estate and acted for it in certain matters, that he attended a conference with bank officials to obtain extensions of certain notes executed and indebtedness incurred by his intestate, and to this end furnished the bank officials with statement of liabilities of the estate, and that he told them the estate owed plaintiff the item sued on. *Held,* testimony of the admission of the attorney was competent in plaintiff's action against the estate on the item as an admission of an authorized agent acting within the scope of his authority.

**5. Same—**

A witness not a party to the action and having no pecuniary interest therein may testify as to admissions of defendant's authorized agent made in the scope of his authority.

**6. Trial E f—**

Where error in statement of contentions of party is not brought to the court's attention at the time, an exception to the charge on this point will not be sustained on appeal.

CIVIL ACTION, before *Schenck, J.,* at February Term, 1933, of Mc-DOWELL.

W. H. McMahan died intestate on 9 January, 1931, and his wife, Mrs. Eva H. McMahan, was duly appointed and qualified as administratrix of his estate. The plaintiff alleged that on 20 February, 1929, he was the owner of twelve shares of the common capital stock of the Blanton Feed Company, a corporation doing business in McDowell County, and that on said date he sold said stock to the deceased, W. H. McMahan, for the sum of $1,200; that said deceased failed and neglected to pay for said stock prior to his death, and that in due time the plaintiff filed a claim with the defendant for said sum. Upon denial of liability this suit was instituted against the estate. The defendant filed an answer denying the vital allegations in the complaint.

At the trial of the action J. W. Pless testified that he was a former law partner of the plaintiff and that there had been certain preliminary negotiations between the deceased McMahan and the plaintiff and the witness with respect to the sale of said stock. The witness said that the deceased "told me he wanted to be the owner of the business so that he could take such course with it as he desired. He talked with me about being desirous of making whatever changes, the sale of the property, the changing of the business, that occurred to him. He said that in making these changes he did not wish to be responsible to any one and therefore he wished to own all this stock. . . . When I was in court here he got Mr. Winborne and me together, at his instance, and said he desired to take this stock and he wished us to have par for it and six per cent interest or that which would amount to six per cent interest. Par was $100.00 per share. He was to pay us as was agreed then, the $3,000 for this stock, that is to Mr. Winborne, Mrs. Winborne and me for the whole of this stock. It was held, as I explained, in this manner and he was to take over the stock. . . . Mr. Winborne stated that he would accept that for that which he represented. Mr. McMahan had been informed by me before and knew that my stock was up at the First National Bank as collateral security to a note which the bank held against me, and in this conversation when the transaction was being closed it was stated that all the stock, as I recall, was in the bank and he was to take the stock out of the bank. He said he would take the stock out of the bank. . . . No time was fixed that I know of. It was an agreement that went into effect then. . . . He was to pay the bank for this stock and take it up. I went and arranged with the bank so that I could take my stock and credit my note for the amount he was to pay for it. Mr. McMahan agreed to pay this price for the stock to the bank to obtain our stock. We agreed that we would have nothing further to do with the business and that he could do as he pleased with it. Absolutely, we agreed to accept the amount to be paid by Mr. McMahan to the bank as payment for that stock. No other conditions at all were mentioned." The vice-president and cashier of the bank testified that in February, 1929, the bank held twelve shares of the capital stock of the Blanton Feed Company issued to J. W. Winborne, and that the stock was held as collateral for indebtedness to the bank. All said certificates were signed in blank by the stockholders. The witness further testified that after 20 February, 1929, that he had a conversation with the deceased Mr. McMahan and that "he told me he had bought the stock of Mr. Pless and Mr. Winborne, all of it, . . . and that he would take it up as soon as he had funds available." Mr. Winborne came in and told me he had sold his stock to Mr. McMahan; . . . that Mr. McMahan was to pay him $100.00 per share, and when

paid the certificate was to be delivered to him and his note credited with the amount received. The bank agreed to do that. The stock was to have been taken up by Mr. McMahan. The stock certificate is still at the bank. Since that time . . . the bank would have transferred that stock and delivered it to Mr. McMahan upon the completion of the arrangement Mr. Winborne described to me." This witness further testified that after the death of Mr. McMahan that there was a directors meeting at the bank and that Mr. E. H. McMahan came to the meeting and in going over the affairs of the estate said "that the estate owed Mr. Pless and Mr. Winborne $3,000 . . . for a contract entered into between W. H. McMahan and Mr. Pless and Mr. Winborne." This witness further testified that the deceased prior to his death in discussing his business affairs referring to the stock of the Blanton Feed Company, "told me he had contracted to acquire it all. He told me he had entered into a contract, whether it was written or verbal I don't know, with Mr. Pless and Mr. Winborne to buy their stock and when he acquired that stock then he would own the whole of it."

The president of the bank testified that Mr. E. H. McMahan "came in there to see about some notes which the estate owed there and he gave an account of the liabilities and assets and in it he said they owed Mr. Pless and Mr. Winborne $3,000. . . . That was after the death of his father."

The plaintiff testified that in February, 1929, following the conference between the witness and Mr. Pless and the deceased that he went to the bank and told the vice-president and cashier that he had sold the stock and instructed him "to deliver the stock on the payment of the purchase price." Witness further testified that he had filed a claim for $1,200 against the estate, and that Mr. E. H. McMahan had written a letter to the effect that the estate would not pay the claim.

Mr. E. H. McMahan, attorney at law, and son of deceased, testified that he had never acknowledged the validity of the claim of the plaintiff against the estate, and that he had never stated to the plaintiff that the estate would vote the stock issued to the plaintiff in a stockholders' or directors' meeting. The testimony of defendant tended to show that the deceased had never purchased the stock but was merely negotiating with the plaintiff and that no stock had ever been delivered to the deceased in his lifetime by the plaintiff, and that consequently the estate was not liable.

Two issues were submitted by the court, as follows:

(1) "Did the defendant's intestate, W. H. McMahan, contract with the plaintiff, J. W. Winborne, to purchase the twelve shares of stock of Blanton Feed Company owned by him (Winborne), as alleged in the complaint?"

(2) "What amount, ·if anything, is the defendant indebted to the plaintiff?"

The jury answered the first issue "Yes," and the second issue "$1,200 with interest."

From judgment upon the verdict the defendant appealed.

*Robt. W. Proctor and J. W. Pless, Jr., for plaintiff.*
*Guy Weaver and Edward H. McMahan for defendant.*

BROGDEN, J. The exceptions and assignments of error present four primary questions of law, as follows:

1. Was there sufficient evidence of a sale of the stock to be submitted to the jury?

2. Was the testimony of J. W. Pless incompetent by virtue of the application of C. S., 1795?

3. Were the admissions of E. H. McMahan to the plaintiff and to the officials of the bank competent against the estate?

4. Was the testimony of Neal with respect to admissions made by the alleged attorney of the estate competent?

The jury found that the deceased had contracted with the plaintiff to purchase twelve shares of the capital stock of Blanton Feed Company. The evidence of Mr. Pless was to the effect that the deceased had agreed to purchase the stock and to pay therefor the sum of $1,200. The twelve shares of stock owned by the plaintiff were held by the bank as collateral for an indebtedness due the bank by the plaintiff. There was evidence from the plaintiff and from Mr. Pless and officials of the bank that the deceased was to take up this stock at the bank, paying the bank therefor and receiving the stock which had already been signed in blank by the owner. There was evidence that the deceased had stated to the officials of the bank that he had purchased the stock and "would take it up as soon as he had funds available." This evidence, if competent, tended to establish a sale. Quoting from Tiffany on sales, this Court in *Teague v. Grocery Co.,* 175 N. C., 195, 95 S. E., 173, said: "When there is a contract of sale of specific goods, the property in them is transferred at such time as the parties to the contract intended it to be transferred. When there is a contract for the sale of specific goods, unless a different intention appears, the property in the goods passes to the buyer when the contract is made." The Court further said: "On the present record, there are facts in evidence tending to show that this transaction was an executed contract of sale, having reference to designated and specific pieces of property, and if these facts should be accepted by the jury, it is well understood that present physical delivery of the property is not necessary to the transfer of the title but that the same passes ac-

cording to the intent of the parties as expressed in the contract between them, and further, that, in the absence of specific agreement on the question, the presumption is that the title passed at the time of the purchase and without such delivery." See, also, *Cohen v. Stewart,* 98 N. C., 97.

The evidence discloses that no further act was to be performed by the seller, and the only act to be performed by the purchaser was to step into the bank, pay the purchase money and put the stock in his pocket. Such evidence therefore established a contract of sale.

The defendant, however, asserts that the evidence of J. W. Pless tending to establish the sale was not competent by reason of the inhibition of C. S., 1795. The evidence discloses that Mr. Pless had contracted to sell his stock to the deceased at the same time the Winborne sale was effected. Consequently, the pertinent question is: Did Pless have a pecuniary interest in the sale of the stock to Winborne, or would he get anything of financial value out of the lawsuit if it terminated favorably for his former law partner, the plaintiff? See *Chemical Co. v. Griffin,* 204 N. C., 559; *Hager v. Whitener,* 204 N. C., 748; *Vannoy v. Green, post,* 80. The record discloses that Mr. Pless was asked that if he should make a claim for anything on the stock he agreed to sell, would not the same evidence applicable to the Winborne case be applicable to his case? The witness said: "My evidence relates to one transaction. I have no claim and I suppose I am not capable of making a claim now. If the statute were not pleaded, I don't know that I could bring a suit against the estate." The foregoing answer of the witness was elicited by counsel for the defendant and plainly discloses that the witness had no pecuniary interest in the outcome of the trial. He declared unequivocally, "I have no claim." Consequently the evidence was properly admitted.

The third question of law involves the competency of alleged statements made by Mr. E. H. McMahan to the plaintiff and to the officials of the bank to the effect that the estate owed the plaintiff for the stock. The defendant earnestly contends that declarations made by a lawyer in a conference and not during the progress of the trial impose no liability upon an estate and cannot be used as a means of establishing the validity of a claim against a dead man. In arriving at the proper conclusion upon the question, it is necessary to observe the relationship of the parties and other pertinent facts and circumstances. It was alleged in the complaint "that E. H. McMahan, as the son and attorney for the defendant, Mrs. Eva McMahan, administratrix, actively managed and directed the administration of the estate of W. H. McMahan and was authorized and empowered by said administratrix to act for her in the administration of said estate, for, and in her place and stead, as plaintiff is informed and believes and so alleges." The original pleading filed by

the defendant, answering paragraph 8 of the complaint, declares: "That it is admitted that he has acted as attorney for her in matters pertaining to the administration of the said estate." Thereafter the complaint was amended by inserting the word "certain" in paragraph 8 between the word "in" and the word "matters." The plaintiff offered the said admission in the original answer and the defendant objected. This objection, however, is not sustained upon authority of *Morris v. Development Co.,* 194 N. C., 279, 139 S. E., 433.

E. H. McMahan signed the answer as attorney for the defendant. He attended a directors meeting of the bank and gave an account of the assets and liabilities of the estate. He was present at the meeting in response to a letter from the cashier of the bank to discuss "the line of credit extended the Blanton Feed Company and to W. H. McMahan." He testified: "I was then asked to look into the assets and liabilities of the estate and a few things of that nature and attend another meeting. . . . Our purpose in attending the meeting was to try to persuade the bank to carry on outstanding notes my father owed and notes the company owed and prevent a closing out of the company's business and also to prevent a foreclosure of certain valuable property that my father had as security at the bank. All the directors were there. . . . As I recall I read this report filed by me in behalf of the administrator of the estate in which I referred under an exhibit to the amount of claims which had been filed against the estate." Consequently it is manifest that the attorney was present representing the estate and undertaking to secure indulgence upon the basis of assets and liabilities. Thus, the amount and validity of claims filed against the estate was a vital factor in the conference. Under such circumstances it was competent to show an admission of liability made by counsel. This conclusion is supported by the principles announced and applied in *Richardson v. Satterwhite,* 203 N. C., 113, 164 S. E., 825. Such admission of course "does not conclusively bind the defendant or give it the effect of a solemn admission *in judicio.* It would merely stand upon the same footing as the declaration of any other authorized agent."

The testimony of Neal, presenting the fourth question of law, was competent. He was not a party to the suit and had no pecuniary interest in the outcome thereof.

The point is made that the trial judge did not correctly state the contentions of the parties. However, this matter was not called to the attention of the court at the time, and in such event the exceptions must fail. *S. v. Sinodis,* 189 N. C., 565, 127 S. E., 601.

There are other exceptions in the record, but none of them warrant the overthrow of the judgment.

Affirmed.